O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

|  |  |
|---|---|
| **GREAT AMERICAN INSURANCE COMPANY,** | **Case No.: SA CV 15-1161-DOC (Ex)** |
| **Plaintiff,** | |
| **vs.** | **ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT RE: PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GREAT AMERICAN'S COMPLAINT [18]; DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO SEQUOIA'S DUTY TO DEFEND OR INDEMNIFY MILLENIUM COMM. MGT., INC. [22]** |
| **SEQUOIA INSURANCE COMPANY,** | |
| **Defendant.** | |

Before the Court are Plaintiff Great American Insurance Company's ("Great American" or "Plaintiff") Motion for Partial Summary Judgment ("Plaintiff's Motion") (Dkt. 18) and Defendant Sequoia Insurance Company's ("Sequoia" or "Defendant") Motion for Summary

Judgment (Defendant's Motion") (Dkt. 22) (collectively, "Cross Motions for Summary Judgment").

## I.   Facts

In this action, Plaintiff Great American seeks judicial declarations and judgments of equitable contribution and equitable subrogation confirming its right to recover amounts it alleges should have been paid by Sequoia for the defense and settlement of claims asserted against their common insured, Millennium Community Management, LLC ("MCM"), in the Underlying Action in Orange County Superior Court. Great American asserts five causes of action against Sequoia: (1) declaratory relief regarding Sequoia's breach of its duty to defend claims, (2) declaratory relief regarding Sequoia's breach of its duty to reimburse amounts paid to defend claims asserted against MCM in the Underlying Action, (3) declaratory relief regarding Sequoia's obligation to reimburse amounts paid to settle claims asserted against MCM in the underlying action, (4) equitable contribution – defense, and (5) equitable subrogation – settlement. *See generally* Complaint ("Compl.") (Dkt. 1).

### A.   Underlying Action

On February 4, 2014, Alexander J. Vera ("Vera") filed a Complaint for Damages ("State Court Complaint") in Orange County Superior Court ("Underlying Action"), *Vera v. Verano at Talega, et al.*, Case No. 00702650-CU-PO-CJC, against the Verano at Talega Homeowners Association ("Homeowners Association"), Millennium Capital Management, Inc., and Action Property Management (the Homeowners Association's previous property management company), asserting causes of action for negligence and premises liability. Stipulation of Facts and Evidence in Support of Cross-Motions for Summary Judgment ("SFE") (Dkt. 19-1) No. 1.[1] Vera sought to recover damages for severe injuries he sustained on February 10, 2012, when he dived into a swimming pool at Verano at Talega, a condominium complex in San Clemente,

---

[1] Great American and Sequoia have stipulated that, for the purposes of their Cross Motions for Summary Judgment, certain facts "are undisputed and shall be deemed proven without the necessity of further evidence." SFE at 2. The parties have also stipulated that Exhibits A through H to their Stipulation "shall be deemed properly authenticated and admissible evidence solely for purposes of the Cross-Motions." *Id.* at 4. Docket number 27 contains an additional copy of the Stipulation of Facts and Evidence in Support of Cross-Motions for Summary Judgment. To simplify matters, the Court will only refer to Stipulation contained in docket number 19.

California. *Id.* No. 3. On September 17, 2014, MCM was added as Doe 1 to the State Court Complaint. *Id.* No. 2.

The State Court Complaint alleged defendants "are the owners and operators, and/or designers, constructors and maintainers, managers, security providers, and are otherwise in legal control of" the Property. Plaintiff's Statement of Uncontroverted Facts and Conclusions of Law ("Pl. SUF") No. 4; SFE No. 1 Ex. A ("State Court Complaint") ¶ 6. The State Court Complaint also stated:

> On or about February 10, 2012, and before, the defendants, and each of them, negligently, carelessly, recklessly, and unlawfully owned, operated, developed, designed, constructed, built, permitted, licensed, acted upon, secured, managed, and maintained said premises in a dangerous and defective condition in that, among other things: the pool facility signage failed to adequately advise or warn pool users of the shallow water and/or danger of diving; the pool area and pool itself lacked adequate lighting; and the pool facility lacked proper enclosures and/or security procedures to prevent individuals from assessing the unsafe, improperly lit pool area. In particular, said pool facility: failed to provide any visible, effective, legible and conspicuous warnings or signs regarding pool usage; failed to be properly lit, both inside and outside the pool, while accessible pool users; and allowed users to access and utilize an unsafe and completely unlighted pool so as not to comply with reasonable standards of care. Additionally, the pool area lighting was programmed to turn off at a time when pool users were still in the pool area and foreseeably using the pool. There were not security procedures to ensure that the pool patrons exited the pool area before the pool lights went off. Said condition failed to comply with codes and standards as required by California law, among them the lighting requirements as well as access requirements and prohibitions, so as to constitute negligence per se.

State Court Complaint ¶ 6. Further, the State Court Complaint contended that, as a result of the alleged deficiencies, Vera, who was seventeen years of age at the time of the accident, was "of the impression that the pool was deep enough for diving." Pl. SUF No 5; State Court Complaint ¶ 7. Vera alleged the pool area was lit when he entered it, but the lights turned off while he was walking toward the spa. Pl. SUF No. 6; State Court Complaint ¶ 9. After using the spa, "he chose to switch to the pool, which he thought would be deeper for diving, and other activities." Pl. SUF No. 6; State Court Complaint ¶ 9. "Upon diving into the pool for the first time, he severely injured his spinal cord and is now a quadriplegic." Pl. SUF No. 6; State Court Complaint ¶ 9.

### B.  The Common Interest Development Contract Inclusive

At the time of Vera's accident, MCM served as "Managing Agent" for the Homeowners Association pursuant to an agreement entitled the "Common Interest Development Contract Inclusive" ("Agreement"). SFE No. 4. The Agreement had a one-year term from August 1, 2010 through July 31, 2010, but would automatically renew from year to year for additional one-year terms unless otherwise terminated. SFE No. 4; *id.* Ex. B ("Agreement") at 12.

As set forth under Section 3 of the Agreement, "MCM's Duties," the following were among the tasks MCM was responsible for performing on behalf of the Homeowners Association:

> a. As detailed herein, MCM will undertake reasonable efforts to implement lawful decisions of the board.
>
> . . .
>
> b. MCM will act as liaison with contractors for any corrective work on common areas and facilities of the property.
>
> c. Except in an emergency (when immediate action is required to protect the lives or the property), MCM will not make or authorize any alterations, repairs or improvements to the property that cost more than $500.00, without first securing the approval of the [Homeowners] Association's Board of Directors ("the Board").

d. If non-emergency repairs, alterations or improvements to the property become necessary, MCM will secure competitive bids for the work. These bids will be submitted to the Board for approval before any contract is awarded or work begun.

e. MCM will provide a 24-hour answering service in order to handle emergencies in the common area and facilities of the [Homeowners] Association.

f. MCM will make inspections of the property twice per month. The purpose of these inspections is to identify:

    1. Landscape/maintenance issues

    2. Other items as requested by the Board

    3. Documenting violations for enforcement by the Board

. . .

m. MCM is authorized to secure emergency repairs (necessary for the preservation of life and property) at any reasonable cost, which will be paid by the [Homeowners] Association.

Agreement at 12–13.

### C. Defense of Claims Asserted Against MCM in the Underlying Action

AMCO Insurance Company ("AMCO") and Great American are the primary and excess insurers, respectively, of the Homeowners Association, for which MCM served as Managing Agent. Defendant's Statement of Uncontroverted Facts and Conclusion of Law ("Def. SUF") Nos. 13–14. AMCO defended the claims asserted against MCM in the Underlying Action. Pl. SUF No. 7. AMCO and Great American learned MCM's registration to do business in California had been placed into forfeiture by the Franchise Tax Board, and therefore MCM could not be defended under its own name. Pl. SUF No. 7; SFE No. 8. AMCO and Great American therefore intervened in the Underlying Action to continue defending the claims asserted against MCM. Pl. SUF No. 7; SFE No. 8.

**D. Tender of Defense to Sequoia and Sequoia's Denial of the Duty to Defend**

Sequoia, which issued a primary liability insurance policy to MCM (set out in detail below), first received notice of the Underlying Action on September 24, 2014. SFE No. 9. In an October 27, 2014 letter to MCM, Sequoia denied any obligations with respect to the defense and indemnity of MCM in the Underlying Action, citing the Professional Services Exclusion in the Designated Work Exclusion in the Sequoia Policy. SFE No. 9; *id.* Ex. F ("October 27, 2014 Declination Letter"). AMCO and Great American subsequently demanded that Sequoia acknowledge its defense obligation and protect its insured, but Sequoia continued to deny any defense or indemnity obligation under the Professional Services Exclusion. SFE No. 10; Pl. SUF No. 9.

**E. Settlement of Claims Asserted Against MCM in the Underlying Action**

AMCO and Great American settled the claims asserted against MCM and the Homeowners Association at a mediation held on March 18, 2015. SFE No. 11; Pl. SUF No. 10. Pursuant to the settlement, which was memorialized in the Settlement Agreement and Release of All Claims, Allied Insurance Company (as AMCO's parent company) paid $1 million, and Great American paid $2 million to settle Vera's claims against MCM and the Homeowners Association. SFE No. 11; *id.* Ex. G ("Settlement Agreement and Release of All Claims").

**F. The Policies**

**1.    The Sequoia Policy**

Sequoia issued a primary general liability insurance policy – Enterprise Insurance Policy Number SBP213777-3 ("Sequoia Policy") – to MCM for the policy period of March 1, 2011 to March 1, 2012. SFE No. 5. In the Sequoia Policy, MCM is identified as a "Property Management Company." SFE No. 5; *id.* Ex. C ("Sequoia Policy") at 27. The Sequoia Policy provides liability coverage for bodily injury as the result of an accident during the policy period. SFE No. 5. The Sequoia Policy also contains a Liability and Medical Limit of $1 million per occurrence. Pl. SUF No. 15; Sequoia Policy at 32. Further, the Sequoia Policy contains the following language relevant to Sequoia's defense and indemnity obligations:

SECTION II – LIABILITY

A. Coverages

1. Business Liability

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any suit seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury", to which this insurance does not apply.

. . .

B. Exclusions

1. Applicable to Business Liability Coverage

This insurance does not apply to:

. . .

j. Professional Services

"Bodily injury", "property damage", "personal and advertising injury" caused by the rendering or failure to render any professional service. This includes but is not limited to:

(1) Legal, accounting or advertising services;

(2) Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications

(3) Supervisory, inspection or engineering services;

(4) Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;

(5) Any health or therapeutic service, advice or treatment;

(6) Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming;

(7) Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices.

(8) Body piercing services; and

(9) Services in the practice of pharmacy.

Sequoia Policy at 62, 65, 68.

### G. The AMCO Policy

AMCO defended the claims asserted against MCM in the Underlying Action under Premier Businessowners Policy Number ACP BPH 7811638915, which was issued to the Homeowners Association for the policy period of August 10, 2011 to August 10, 2012 ("AMCO Policy"). SFE No. 6; *id.* Ex. D ("AMCO Policy"). According to the Liability Declarations, the AMCO Policy contains a limit of $1 million per occurrence for liability and medical payments. Pl. SUF No. 20. AMCO defended MCM as an automatic insured under Section II, "Who Is an Insured of Premier Businessowners Liability Coverage Form PB 00 06 04 11, which states that "[a]ny . . . organization while acting as your real estate manager" is "also an insured." *Id.*

### H. The Great American Policy

Great American defended and settled claims asserted against MCM in the Underlying Action under Umbrella and Excess Liability Insurance Master Policy Number UM238690 issued to Distinguished Property Umbrella Managers, Inc. and its Members ("Great American Policy"). Pl. SUF No. 22; SFE No. 7; *id.* Ex. E ("Great American Policy"). The Homeowners Association and MCM were insureds under this policy. On June 11, 2011, Great American issued Certificate of Coverage Number 1473819 ("Certificate") to the Homeowners Association for the Coverage period of August 10, 2011 to August 10, 2012. SFE No. 7. As reflected on the Certificate, the Great American Policy contains limits of liability of $5 million for each occurrence and a $5 million general aggregate. Pl. SUF No. 24; Great American Policy at 330–31.

As set forth in a Named Insured endorsement, the Homeowners Association, as a Member of Distinguished Property Umbrella Managers, Inc., is a "Named Insured" under the Great American Policy. Great American Policy at 336. The Great American Policy also contains an endorsement entitled "Broad Names Insured – Real Estate Owners – Lessors Risk Only," which defines "[i]nsured" to include "[a]ny person, other than one of your employees, or organization while acting as your real estate manager." *Id.* at 337–38. In addition, the Great American Policy contains "The Protector Commercial Umbrella Coverage Form," which states:

I. Coverage

We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit" that the "Insured" becomes legally obligated to pay by reason of liability imposed by law or assumed by the "Insured" under an "insured contract" because of "bodily injury," "property damage," "personal injury," or "advertising injury" that takes place during the Policy Period and is caused by an "occurrence" happening anywhere.

. . .

II. Limits of Insurance

. . .

G. Retained Limit

We will be liable only for that portion of damages, subject to the Each Occurrence Limit stated in the Declarations, in excess of the "retained limit," which is the greater of:

1. the total amounts stated as the applicable limits of the underlying policies listed in the Schedule of Underlying insurance and the applicable limits of any other insurance providing coverage to the "Insured" during the Policy Period; or

2. the amount stated in the Declarations as Self-Insured Retention as a result of any one "occurrence" not covered by the underlying policies listed

in the Schedule of Underlying Insurance nor by any other insurance providing coverage to the "Insured" during the Policy Period.

Great American Policy at 340–41.

### A. Recovery Sought

Great American asserts that, following the settlement of the Underlying Action, AMCO contractually assigned its rights to obtain reimbursement of the amounts AMCO paid for the defense of claims asserted against MCM in the Underlying Action to Great American. Pl. SUF No. 12. Pursuant to that assignment, Great American now seeks to recover from Sequoia those amounts AMCO paid to defend the claims asserted against MCM in the Underlying Action. *Id.* No. 13. Great American also seeks to recover amounts it paid for the settlement of such claims. Pl. SUF No. 13. Sequoia objects to Great American's evidence that AMCO assigned Great American its rights and disputes that a valid assignment exists. *See* Sequoia Insurance Company's Objections in Support of Reply to Motion for Summary Judgment to Great American's Evidence ("Def. Objections") (Dkt. 41); Sequoia Insurance Company's Genuine Disputes of Material Fact in Opposition to Great American Insurance Company's Motion for Partial Summary Judgment ("Def. SGD") (Dkt. 35-1) No. 12.

### II.   Procedural History

Great American filed suit against Sequoia on July 23, 2015. Complaint ("Compl.") (Dkt. 1). In its Complaint, Great American alleges Sequoia had a duty to defend its named insured MCM in the Underlying Action. *See generally* Compl.

On December 1, 2015, Great American and Sequoia filed their Cross Motions for Summary Judgment (Dkts. 18, 22). Each party filed an Opposition on February 8, 2016. (Dkts. 33, 34). Sequoia replied on February 12, 2016 (Dkt. 40), and Great American replied on February 16, 2016 (Dkt. 41).[2]

### III.   Summary Judgment Under Rule 56

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[2] On December 15, 2015, the Court advanced the hearing on the Cross Motions for Summary Judgment from June 20, 2016 to February 29, 2016. Order on Stipulation Re Hearing Date on Cross-Motions for Summary Judgment (Dkt. 31).

56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

## IV.   Discussion

Both parties move for summary judgment on the issue of whether Sequoia had a duty to defend the claims asserted against MCM in the Underlying Action. Pl. Mot. at 1–2; Def. Mot. at 1–2. Plaintiff further moves for summary judgment on the grounds that it is entitled to equitable contribution from Sequoia for amounts paid by AMCO as Great American's assignor

(Great American's second and fourth causes of action), and on the grounds that Great American is equitably subrogated to MCM's right to recover from Sequoia $1 million of the amount Great American paid toward the settlement of claims asserted against MCM in the Underlying Action (Great American's third and fifth causes of action). Pl. Mot. at 2. The Court will first address whether Sequoia had a duty to defend and breached that duty.

### A.  Duty to Defend Under California Law

Sequoia does not dispute the Underlying Action was a "suit" potentially seeking damages from MCM because of "bodily injury," such that it fell within Sequoia's coverage. Rather, the parties dispute whether the "Professional Services Exclusion" in the Sequoia Policy, *see* Sequoia Policy at 68 (providing coverage is excluded for "'bodily injury' caused by the rendering or failure to render any professional service"), defeats coverage for the allegations against MCM in the Underlying Action. Sequoia asserts the Professional Services Exclusion applies while Great American argues it did not eliminate the potential for coverage under the Sequoia Policy. Pl. Mot. at 14; Def. Opp'n at 1. Therefore, the Court must determine whether the Professional Services Exclusion applies to bar coverage to MCM for the allegations in the Underlying Action such that Sequoia had no duty to defend.[3]

### 1.     Legal Standard

Under California law, "an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." *Big 5 Sporting Goods Corp. v. Zurich Am. Ins. Co.*, 957 F. Supp. 2d 1135, 1143 (C.D. Cal. 2013) *aff'd*, No. 13-56249, 2015 WL 8057228 (9th Cir. Dec. 7, 2015) (quoting *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 19 (1995) (internal quotation marks omitted)). The insurer "bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the policy." *Id.* (quoting *Paramount Props. Co. v. Transamerica Title Ins. Co.*, 1 Cal. 3d 562, 571 (1970) (internal quotation marks omitted)). Further, "[a]n insurer must defend its insured against claims that create a *potential* for indemnity under the

---

[3] Because Sequoia does not argue the Designated Work Exclusion bars a defense obligation under the Sequoia Policy (indeed, Sequoia relies only on the Professional Services Exclusion), the Court need not reach Great American's arguments concerning why that exclusion does not negate the duty to defend.

policy." *Id.* (citing *Montrose Chemical Corp. v. Superior Court*, 6 Cal. 4th 287, 295 (1993) (internal quotation marks omitted)). The duty to defend is broader than the duty to indemnify, and it may apply even in an action where no damages are ultimately awarded. *Id.* (citing *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993)).

As the court in *Waller* explains, "*Gray*[*v. Zurich Ins. Co.*, 65 Cal. 2d 63 (1996)] and its progeny have made it clear that the determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." *Id.* (quoting *Waller*, 11 Cal. 4th at 19) (internal quotation marks omitted)). "Facts extrinsic to the complaint also give rise to the duty to defend when they reveal a possibility that the claim may be covered by the policy." *Horace Mann*, 4 Cal. 4th at 1081 (citation omitted). On the other hand, "the insurer need not defend if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage." *Gray*, 65 Cal. 2d at 276. Further, "where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability." *Waller*, 11 Cal. 4th at 19.

"Notwithstanding the special features of insurance contracts, they are still subject to the ordinary rules of contractual interpretation." *Big 5 Sporting Goods*, 957 F. Supp. 2d at 1143 (citation omitted). When a policy's terms are plain and explicit, "courts will not indulge in a forced construction so as to fasten a liability on the insurance company which it has not assumed." *Id.* (quoting *First Am. Title Ins. Co. v. XWarehouse Lending Corp.*, 177 Cal. App. 4th 106, 115 (2009) ("*XWarehouse*") (internal quotation marks omitted)). "Only if an asserted ambiguity is not eliminated by the language and context of the policy will courts invoke the principle that 'ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.'" *Id.* at 1143–44 (quoting *XWarehouse*, 177 Cal. App. 4th at 115). However, courts interpret coverage clauses broadly. *Id.* (citing *Safeco Ins. Co. of Am. v. Andrews*, 915 F.2d 500, 502 (9th Cir. 1990)). Indeed, "provisions relating to exclusions or exceptions from the performance of a

basic, underlying obligation are construed strictly against the insurer and liberally in favor of the insured." *Paramount Props.*, 1 Cal. 3d at 569.

### 2. Discussion

The parties dispute whether the Professional Services Exclusion in the Sequoia Policy applies to defeat coverage to MCM for the allegations in the Underlying Action. Sequoia's position is that MCM's services as property manager were "wholly professional in nature," "MCM's only potential liability in the Underlying Action was necessarily based on its professional obligation to manage the subject complex," and that "[a]ll of the allegations against MCM were based upon and limited by MCM's obligations as outlined within its contract with the [Homeowners Association] to inspect[,] advice[,] and report to the [Homeowners Association]." Def. Reply at 3. Great American, on the other hand, asserts the State Court Complaint "does not specifically identify the acts or omissions on the part of MCM that are alleged to have contributed to Mr. Vera's accident," Pl. Mot. at 15, but that the "Professional Services Exclusion did not eliminate the potential that MCM's liability for the injuries in question arose from acts or omissions that did not constitute 'professional services,' while serving as the [Homeowners] Association's property manager." Pl. Reply at 2. Particularly given "the requirement that the court construe policy exclusions narrowly," *Food Pro Int'l, Inc. v. Farmers Ins. Exch.*, 169 Cal. App. 4th 976, 991 (2008), the Court is persuaded by Great American's arguments.

California courts have defined "professional services" as those "'arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill is predominantly mental or intellectual, rather than physical or manual.'" *Tradewinds Escrow, Inc. v. Truck Ins. Exch.*, 97 Cal. App. 4th 704, 713 (2002) (quoting *Hollingsworth v. Commercial Union Ins. Co.*, 208 Cal. App. 3d 800, 806 (1989)). In addition, "professional services" is "a broader definition than 'profession,' and encompasses services performed for remuneration." *Id.* California courts have also noted "the unifying factor" in applying the exclusion is based on "whether the injury occurred during the performance of the professional services, not the instrumentality of injury." *Id.*; *see also Food Pro*, 169 Cal. App.

4th at 991 ("We read *Tradewinds*' summation of the reach of the professional services exclusion as follows: the act that precipitated the injury need not have been one of professional malpractice, so long as the plaintiff as injured in the performance of the professional service.").

The Professional Services Exclusion in the Sequoia Policy defines professional services only by way of examples. Relevant here, under the Sequoia policy, professional services include: "[p]reparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications" and "[s]upervisory, inspection or engineering services." SFE Ex. C at 62, 65, 68.

With the terms of the Sequoia Policy in mind, the Court first looks to some of the pertinent allegations in the State Court Complaint in the Underlying Action. The State Court Complaint alleged that the defendants (including MCM)

> negligently, carelessly, recklessly, and unlawfully owned, operated,
> developed, designed, constructed, built, permitted, licensed, acted upon,
> secured, managed and maintained said premises in a dangerous and
> defective condition in that, among other things: the pool facility signage
> failed to adequately advise or warn pool users of the shallow water and/or
> danger of diving; the pool area and pool itself lacked adequate lighting; and
> the pool facility lacked proper enclosures and/or security procedures to
> prevent individuals from accessing the unsafe, improperly lit pool facility
> area.

State Court Complaint ¶ 6. The State Court Complaint also contended "the pool area lighting was programmed to turn off at a time when pool users were still in the pool area and foreseeably using the pool" and "there were no security procedures to ensure that pool patrons exited the pool area before the pool lights went off." *Id.* Further, the State Court Complaint asserted "Defendants did not take any steps to block entrance [sic] to the unsafe pool or to remove pool users form the pool area when the lights are turned off." *Id.* ¶ 9; *see also id.* ¶ 23. As Great American points out, *see* Pl. Mot. at 15, the State Court Complaint does not specifically connect MCM with particular acts or omissions that allegedly contributed to Vera's

accident. Particularly given the State Court Complaint's broad allegations, the Court finds some of MCM's conduct allegedly connected to Vera's accident potentially did not involve "specialized knowledge, labor, or skill" that was "predominantly mental or intellectual." In other words, the allegations in the State Court Complaint are too general for the Court to conclude there was no potential for coverage under the Sequoia Policy. *See Gray*, 65 Cal. 2d at 276  ("[T]he insurer need not defend if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage."). For example, the alleged acts or omissions concerning the programming of the pool area lighting may not have arisen from the provision of professional services. *See Food Pro*, 169 Cal. App. 4th at 989 ("The facts available to Farmers at the time it denied a duty to defend thus show potential liability arising from the breach of a common law duty, and not from the performance of professional services."); *cf. Pennsylvania Nat. Mut. Cas. Ins. Co. v. Roberts Bros.*, 550 F. Supp. 2d 1295, 1306 (S.D. Ala. 2008) ("Under no ordinary common-sense meaning of the term is it a 'professional service' for a property manager to perform (or fail to perform) the strictly clerical task of picking up the telephone to call a handyman to repair a broken door. This omission forms the sole basis of the claims against Roberts Brothers in the underlying lawsuit.").

The Court's inquiry, however, does not end with the State Court Complaint. In support of its position that the Professional Services Exclusion eliminates the potential for coverage, Sequoia points to extrinsic evidence – the Agreement between MCM and the Homeowners Association. Based on this Agreement, Sequoia argues MCM's duties were "exclusively 'mental or intellectual'" and that nothing MCM "allegedly did, or was required to do in its capacity as real estate manager for the [Homeowners Association] involved 'physical or manual' labor," and therefore, MCM's potential liability was "limited to the failure to act as a professional in exercising its 'specialized knowledge, labor, or skill' as a real estate manager in identifying issues for action to the [Homeowners Association] and reporting such issues." Def. Reply at 4; *see also* Def. Opp'n at 7.

Looking to the Agreement, the Court concludes that some of "MCM's Duties" do constitute professional services as the term is defined in the Sequoia Policy. For example,

MCM's responsibilities pursuant to the Agreement included making "inspections of the property twice a month," the purpose of which is to identify: 1)"[l]andscape maintenance issues," 2) "[o]ther items as requested by the Board," and 3) "[d]ocumenting violations for enforcement by the Board." SFE Ex. B at 12–13.[4] However, the Court disagrees with Sequoia's assertion that all of MCM's activities were necessarily "professional services" and that the Agreement definitely excluded from MCM's duties any "physical or manual" labor. Indeed, the Agreement suggested MCM could undertake activities outside the realm of pure advice and inspection. For example, the section of the Agreement entitled "MCM's Duties" included the following: "Except in an emergency (when immediate action is required to protect the lives or the property), MCM will not make or authorize any alterations, repairs or improvements to the property that cost more than $500.00, without first securing the approval of the [Homeowners] Association's Board of Directors . . . ." SFE Ex. B at 13. That provision suggests that, in a non-emergency situation, MCM may have been permitted to make alterations, repairs or improvements that cost $500 or less.[5] In other words, the language of the Agreement contemplates that MCM would complete low-cost alterations, repairs, or improvements itself. Performing such a task would not constitute an "inspection . . . service[]" within the meaning of the Professional Services Exclusion, nor does the Court conclude such a task would necessarily fall within the definition of professional services set out in *Tradewinds*. The Court therefore disagrees with Sequoia's statement that all of MCM's activities constituted professional services, *see, e.g.*, Def. Mot. at 8 ("MCM's services were wholly professional in nature"), and that all of the allegations in the State Court Complaint were necessarily predicated upon a

---

[4] Great American does not appear to dispute that some of MCM's responsibilities as the Homeowners Association's Managing Agent constitute "professional services." *See* Pl. Mot. at 15 ("As set forth in the Agreement, MCM had numerous responsibilities as the Homeowners Association's Managing Agent, *not all of which* fit the *Tradewinds* definition of 'professional services.'") (emphasis added).

[5] The Court recognizes the next provision in the "MCM's Duties" section provides: "If non-emergency repairs, alterations or improvements to the property become necessary, MCM will secure competitive bids for the work. These bids will be submitted to the Board for approval before any contract is awarded or work begun." SFE Ex. B. at 13. However, the Court does not read this provision to exclude the small non-emergency repair work contemplated by the language in the provision discussed above. It is unlikely MCM would be required to secure competitive bids for a repair or improvement that costs $50, for instance.

failure to discharge professional services.[6] Sequoia has not shown the extrinsic facts – here the Agreement – "*eliminate* the potential for coverage." *Waller*, 11 Cal. 4th at 19 (emphasis added).

Moreover, the inquiry into whether the Professional Services Exclusion applies does not end with an examination of the Agreement. California courts that have discussed whether professional services exclusions apply have not stopped their analyses upon determining that a contract involves the provision of professional services, but rather have gone on to assess whether "the injury arose from the performance of a professional service," or whether the injury merely occurred "at the same time the insured was otherwise providing professional services to a third party." *Food Pro*, 169 Cal. App. 4th at 991; *see also Atain Specialty Ins. Co. v. 20 Parkridge, LLC*, No. 15-CV-00212-MEJ, 2015 WL 2226356, at *10 (N.D. Cal. May 11, 2015) (analyzing California law and concluding that determining the applicability of the professional services exclusion "in this case requires a greater understanding of the services Defendants provided, the actual injuries claimed in the Underlying Action, and the timing that Defendants may have rendered or failed to render the potential professional services."). For instance, the *Food Pro* court stated the following:

> We note at the outset that it is clear that Food Pro, as an engineering consultant for equipment installation, provides professional services as the term is used in the CGL policy. Moreover, Food Pro's contract with Mariani involved the provision of professional services . . . . This fact is not disputed. The issue presented involves the extent of Food Pro's professional services, the nature of Aamold's actions as they relate to the Pettigrew incident, and the breadth of the professional services exclusion.

*Food Pro*, 169 Cal. App. 4th at 986. Ultimately, the *Food Pro* court concluded that, "[a]ccepting Food Pro's facts regarding the extent of its site supervision and contractor

---

[6] The Court also disagrees with Sequoia's assertion, based on the unpublished California court of appeal decision in *Golden Eagle Insurance Company v. Lemoore Real Estate and Property Management, Inc.*, No. F061735, 2012 WL 1670475, at *8 (Cal. Ct. App. May 14, 2012), that the Professional Services Exclusion applies wholesale to all activities involved in property management. *See Atain Specialty Ins*, 2015 WL 2226356, at *10 (analyzing California cases).

direction, the underlying actions implicate only a separate act of ordinary negligence involving a third party." *Id.* at 990.

Here, the allegations in the Underlying Action concerning the nature of MCM's conduct as they relate to the Vera incident are somewhat murky. However, based on the record before it – in particular the State Court Complaint and the Agreement – the Court cannot definitively conclude Vera's injury arose out of the rendering or failure to render any professional services. *Id.* at 991; *cf. id.* ("Here, the only link between Food Pro's rending of engineering services and Pettigrew's injury is that the allegedly wrongful actions occurred while Food Pro was on site to provide professional services to Mariani."). The Court finds Sequoia has failed to show the absence of any potential for coverage; Sequoia not met its burden of "provid[ing] conclusive evidence demonstrating that the [Professional Services Exclusion] applies." *Atl. Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1038–39 (2002) ("An insurer may rely on an exclusion to deny coverage only if it provides conclusive evidence demonstrating that the exclusion applies."). Thus, the Court concludes the Underlying Action raised the potential for coverage under the Sequoia Policy, and Sequoia breached its duty to defend the claims asserted against MCM in the Underlying Action. Accordingly, the Court DENIES Defendant's Motion on the grounds that Sequoia owed no duty to defend MCM in the Underlying Action and GRANTS Plaintiff's Motion.[7]

### B.  Claims for Equitable Contribution

Great American asserts it is entitled to equitable contribution for amounts paid to defend claims asserted against MCM in the Underlying Action. Pl. Mot. at 18. Specifically, Great American asserts that Sequoia, as MCM's primary liability insurer, shared in the same level of liability as AMCO, the Homeowners Association's primary liability insurer, with respect to defense of claims asserted against MCM in the Underlying Action. Therefore, Great American argues, as AMCO's assignee, it is entitled to recover amounts AMCO paid beyond its properly

---

[7] Sequoia argues it has no duty to indemnify Great American because it had no duty to defend MCM in the Underlying Action. Def. Opp'n at 13; *see Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.*, 14 Cal. App. 4th 1595, 1612 (1993) ("[A]s there was no duty to defendant against such allegations, there could be no duty to indemnify."). Because the Court has concluded Sequoia had a duty to defend and breached that duty, this argument fails.

allocated share in the defense. *Id.* at 19. Great American also argues it is not precluded from pursing its equitable rights against Sequoia even though it was an intervening insurer.[8]

Sequoia does not dispute its obligation to share the costs of the defense under equitable contribution principles.[9] Indeed, Sequoia's only response is that Great American failed to prove AMCO assigned its rights to Great American. Def. Opp'n at 13–14. In particular, Sequoia argues the only evidence Great American "presents of the existence of a valid assignment of AMCO's rights against Sequoia is a[n] objectionable declaration of plaintiff's own representative, Sharon Wallace." *Id.* at 14. Thus, the only issue for the Court to decide is whether there is a genuine dispute of material fact concerning the assignment.

"While no particular form of assignment is necessary, the assignment, to be effectual, must be a manifestation to another person by the owner of the right indicating his intention to transfer, without further action or manifestation of intention, the right to such other person, or to a third person." *Cockerell v. Title Ins. & Trust Co.*, 42 Cal. 2d 284, 291 (1954). "If from the entire transaction and the conduct of the parties it clearly appears that the intent of the parties was to pass title to the chose in action, then an assignment will be held to have taken place." *McCown v. Spencer*, 8 Cal. App. 3d 216, 225 (1970) (citations omitted). The burden of proving an assignment "falls upon the party asserting rights thereunder." *Cockerell*, 42 Cal. 2d at 292. Further, "[i]n an action by an assignee to enforce an assigned right, the evidence must not only be sufficient to establish the fact of assignment when that fact is in issue, but the measure of sufficiency requires that the evidence of assignment be clear and positive to protect an obligor from any further claim by the primary oblige." *Id.* (citations omitted); *see also Neptune Soc'y Corp. v. Longanecker*, 194 Cal. App. 3d 1233, 1242 (1987).

Here, Great American offers only the Declaration of Sharon Wallace ("Wallace"), Claim Technical Director at Great American, as evidence of the assignment. Wallace declares, "On

---

[8] As noted above, MCM was barred from defending against the claims in the Underlying Action in its own name due to its forfeiture status. Pl. SUF No. 7. Therefore, AMCO and Great American intervened in the Underlying Action. *Id.*

[9] "Equitable contribution apportions costs among insurers sharing the same level of liability on the same risk as to the same insured, and is available when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others." *Safeco Ins. Co. of Am. v. Superior Court*, 140 Cal. App. 4th 874, 879 (2006) (internal quotation marks and citation omitted). The purpose of this rule "is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." *Id.* (internal quotation marks and citation omitted).

June 10, 2015, AMCO assigned its rights to Great American to recover amounts paid by AMCO to defend claims asserted against MCM in the Underlying Action from Sequoia." Declaration of Sharon Wallace ("Wallace Decl.") (Dkt. 18-1) ¶ 4. Sequoia objects to this statement on evidentiary grounds – arguing it is inadmissible hearsay and that it lacks foundation – and contends that Great American's evidence does not satisfy the "clear and positive" standard set out in *Cockerell*. Def. Opp'n at 14. During oral argument, Sequoia also emphasized that Great American has neither produced a written instrument evidencing assignment nor indicated whether the assignment was verbal.

Viewing the facts and drawing inferences in the manner most favorable to Sequoia, *see Diebold*, 369 U.S. at 655, the Court concludes Great American has not met its burden of proving an assignment.[10] The Court agrees with Great American that "it is the substance and not the form of a transaction which determines whether an assignment was intended." *McCown*, 8 Cal. App. 3d at 225. However, "it is essential to the assignment of a right that the assignor manifest an intention to transfer the right." *Sunburst Bank v. Executive Life Ins. Co.*, 24 Cal. App. 4th 1156, 1164 (1994); *see also California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.*, 203 Cal. App. 4th 1328, 1337 (2012) ("If from the entire transaction and the conduct of the parties it clearly appears that the intent of the parties was to pass title to the [property], then an assignment will be held to have taken place.") (citations and internal quotation marks omitted). The Wallace Declaration – the only evidence of assignment in the record – does not sufficiently permit the Court to assess the transaction at issue, the conduct of the parties, or whether AMCO manifested an intention to transfer its rights to Great American to recover amounts paid by AMCO to defend claims asserted against MCM in the Underlying Action. Thus, the Court finds Wallace's conclusory statement that "AMCO assigned its rights to Great American," Wallace Decl. ¶ 3, without more, does not constitute the "clear and positive" evidence of assignment *Cockerell* requires. Accordingly, the Court DENIES Plaintiff's Motion relative to its claims for equitable contribution at this time.

---

[10] The Court need not reach Sequoia's evidentiary objections because, even if the statements in the Wallace Declaration are admissible, the Court concludes they are insufficient to prove an assignment.

### C. Claims for Equitable Subrogation

Great American argues Sequoia is obligated to reimburse Great American for the $1 million Sequoia should have paid to settle the Underlying Action. Pl. Reply at 13. "Equitable subrogation allows the insurer to 'stand[] in the shoes of the insured' and assert all claims against another insurer which the insured himself could have asserted." *Am. Alternative Ins. Corp. v. Hudson Specialty Ins. Co.*, 938 F. Supp. 2d 908, 916 (C.D. Cal. 2013) (quoting *Fireman's Fund Ins. Co. v. Maryland Gas. Co.*, 21 Cal. App. 4th 1586, 1595–97 (1994)). Put differently, "California recognizes the right of an excess insurer who has fully paid the insured's judgment to bring an action against the primary insurer for wrongful refusal to settle based on the theory of equitable subrogation." *Starr Indem. & Liab. Co. v. Peerless Ins. Co.*, No. CV 15-643-JFW JCX, 2015 WL 3843526, at *5 (C.D. Cal. June 22, 2015) (citing *Commercial Union Assurance Cos. V. Safeway Stores, Inc.*, 26 Cal. 3d 912 (1980)).

The parties do not dispute the Great American Policy obligated Great American, as an excess insurer,[11] to pay on behalf of MCM, sums exceeding the "Retained Limit" set out in the American Policy. Great American Policy at 341. The Great American Policy states the "Retained Limit" is that portion of damages " in excess of "the total amounts stated as the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other insurance providing coverage to the insured during the Policy Period." *Id.* The parties do not dispute the Sequoia Policy contains a Liability and Medical Limit of $1 million per occurrence, Pl. SUF No. 15, and that the Great American Policy's "Retained Limit" includes the $1 million per occurrence limit of the Sequoia Policy.

There is also no dispute that, pursuant to the Settlement Agreement and Release of All Claims, AMCO paid $1 million and Great American paid $2 million to settle Vera's claims against MCM in the Underlying Action. SFE No. 11.

---

[11] The Court notes that "'[s]econdary insurance provides coverage *in relation to* the coverage provided by *another* insurer." *MGA Entm't, Inc. v. Hartford Ins. Grp.*, 869 F. Supp. 2d 1117, 1129 (C.D. Cal. 2012). Umbrella secondary insurance "covers occurrences that are *not covered* by the underlying policies of insurance. *Id.* (quoting *Powerine Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 398 n.8 (2005) (internal quotation marks omitted)). Excess insurance is a subcategory of secondary insurance that "attaches upon the exhaustion of underlying insurance coverage for a claim." *Id.* (quoting *Powerine*, 37 Cal. 4th at, 398 n.8 (internal quotation marks omitted)).

Moreover, Sequoia does not challenge Great American's subrogation to the rights of MCM with respect to the recovery of amounts paid to indemnify MCM in the Underlying Action that Sequoia should have paid. Rather, Sequoia only argues there are triable issues of fact concerning the *allocation* of the settlement payment. Def. Opp'n at 14. Specifically, Sequoia notes that "Great American covered both the [Homeowners Association] and MCM and that its settlement released claims against both," and therefore asserts that "[b]ecause Sequoia did not insure the [Homeowners Association] and has no duty to indemnify it, any subrogation claim by Great American against Sequoia is necessarily limited to the amount which is allocable exclusively to Sequoia's only insured, MCM." *Id.* Sequoia then states there is a "dearth of evidence" regarding how the settlement funding was allocated, "assuming it was allocated at all, and poses the following question: "How much of the Great American Settlement was paid for the [Homeowners Association], and how much for MCM?" *Id.*

The Court finds Sequoia's arguments – for which Sequoia cites no authority – unavailing. First, as Plaintiff has pointed out, the Settlement Agreement and Release of All Claims (which the parties have stipulated is deemed properly authenticated and admissible evidence for the purposes of these Motions, SFE at 4) does not allocate the $3 million settlement amount between MCM and the Homeowners Association. *See* Settlement Agreement and Release of All Claims at 7 ("Defendants [Homeowners Association and MCM], by and through their Insurer, have agreed to pay a total of Three Million Dollars . . . in settlement to Plaintiff."). Also, both causes of action in the State Court Complaint were alleged against all defendants. *See generally* State Court Complaint. Sequoia fails to address explain why, given that the Underlying Action settled before trial, MCM and the Homeowner Association's alleged liability should not be allocated on an equal basis.

In addition, the Court cannot square Sequoia's argument that Great American may not be able to recover the entire $1 million Sequoia per occurrence limit with the language and implications of the Great American Policy. If Sequoia had participated in the defense and settlement of the Underlying Action, Great American's obligation to indemnify MCM under the Great American excess policy would not have been triggered until after the full applicable

limits of the underlying policies (here the Sequoia Policy and the AMCO Policy) were exhausted. In other words, Sequoia's applicable $1 million per occurrence limit would have needed to be paid before Great American's obligations under the excess policy would kick in. *See JPI Westcoast Const., L.P. v. RJS & Associates, Inc.*, 156 Cal. App. 4th 1448, 1460 (2007) ("[E]xcess insurance is insurance that is expressly understood by both the insurer and insured to be secondary to specific underlying coverage which will not begin until after that underlying coverage is exhausted and which does not broaden that underlying coverage."); *id.* at 1463–64 ("The undisputed facts here show JPI was an additional insured under the Great American policy and that JPI was covered by the Transcontinental policy for the damages arising from the accident. Thus, under the terms of Great American's policy, it was in excess to the Transcontinental policy. Accordingly, having paid a portion of the settlement funds on behalf of Transcontinental, it was entitled to seek reimbursement from Transcontinental by way of its cross-complaint for equitable subrogation.").

Further, as Plaintiff asserts, "Sequoia's complaint of a 'dearth of evidence' as to . . . allocation [of the $3 million to settle the claims asserted against both MCM and the Association] rings hollow given that if it had . . . defended and settled the claims asserted against MCM in the Underlying Action . . . it could have sought such an allocation had it deemed one appropriate." Pl. Reply at 13. "When a duty to defend is shown, nonparticipating coinsurers are presumptively liable for both the costs of defense and settlement." *Safeco*, 140 Cal. App. 4th at 880. Further, "[o]n the more precise issue of just how much the nonparticipating coinsurer has to pay, the courts have held that, by its refusal to participate, the recalcitrant coinsurer waives the right to challenge the reasonableness of . . . amounts paid in settlement." *Id.* The Court concludes that allowing Sequoia – retroactively and after refusing to participate – to determine how the settlement should be allocated when the settlement agreement itself does not speak to allocation would be inconsistent with the principles underlying *Safeco*. *Cf. United Servs. Auto. Ass'n v. Alaska Ins. Co.*, 94 Cal. App. 4th 638, 644 (2001) ("The underlying principle . . . is that when a liability insurer denies coverage for a third party claim and abandons its insured, it relinquishes the right to object to the manner in which

the claim is resolved by the insured or any other insurer providing coverage for the claim. A contrary rule would render the insured's right to settle meaningless in cases where an insurer denies liability.").

The Court concludes Sequoia has failed to show a genuine dispute of material fact relative to the issue of the allocation of the settlement payment. *See S.A. Empresa de Viacao Aerea Rio Grandense*, 690 F.2d at 1238 ("[A] party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda."). Sequoia has not overcome the presumption that it is liable for the settlement up to the applicable limit of the Sequoia Policy. *See Safeco*, 140 Cal. App. 4th at 880. Accordingly, the Court GRANTS Plaintiff's Motion as to Great American's right to recover in equitable subrogation from Sequoia the $1 million Sequoia should have paid to settle the Underlying Action.

## V.    Disposition

For the foregoing reasons, the Court GRANTS Great American's Motion for Partial Summary Judgment as to Great American's Complaint [18] and DENIES Sequoia's Motion for Summary Judgment [22] as to whether Sequoia had a duty to defend and breached that duty. Further, the Court DENIES Great American's Motion [18] concerning the equitable contribution claims and GRANTS Great American's Motion as to its right to recover in equitable subrogation the $1 million Sequoia should have paid to settle the Underlying Action.

*David O. Carter*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Dated:  March 1, 2016